IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
DEC 30 2011
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| IN RE SHAKEEL S. KHAN and AYESHA M. KHAN ) ) ) ) | Bankr. Case No. 10-15387 |
| RACETRAC PETROLEUM, INC., ) Plaintiff / Appellant, ) ) | |
| v. ) ) | Case No. 1:11cv982 |
| SHAKEEL S. KHAN and AYESHA M. ) KHAN, ) Defendants / Appellees. ) | |

### MEMORANDUM OPINION

This is an appeal from a final judgment[1] issued by the U.S. Bankruptcy Court for the Eastern District of Virginia in an adversary proceeding brought by appellant Racetrac Petroleum, Inc. against appellee Shakeel S. Khan, the Chapter 7 debtor. The central question presented on appeal is whether the Bankruptcy Court erred in concluding that Khan's debt to Racetrac was dischargeable, as it was not a debt for "defalcation while acting in a fiduciary capacity[.]" 11 U.S.C. § 523(a)(4). Because this conclusion is incorrect, the judgment of the Bankruptcy Court must be reversed.

I.

The Bankruptcy Court's judgment is based on facts found as a result of an evidentiary hearing and set forth fully in a memorandum opinion issued contemporaneously with that judgment. *See Racetrac Petroleum v. Khan* (*In re Khan*), Advers. No. 10-1431 (Bankr. E.D. Va. Aug. 1, 2011) ("Mem. Op."). On appeal, the parties do not dispute the Bankruptcy Court's factual findings, which may be succinctly summarized as follows.

---

[1] Appellate jurisdiction over the judgment—a final order—exists pursuant to 28 U.S.C. § 158(a).

Khan is a resident of Virginia and husband of Ayesha M. Khan, who remains a party in the Chapter 7 proceedings, but has been voluntarily dismissed from the adversary proceeding. Racetrac owns and operates stores that sell convenience merchandise and gasoline ("Racetrac stores"). Racetrac is the parent company of Raceway, which owns and operates a separate group of stores displaying the Raceway brand ("Raceway stores"). Operators of Racetrac stores are Racetrac employees; by contrast, operators of Raceway stores are independent contractors. Each Raceway and Racetrac store consists of a gasoline filling station and a convenience store. All gasoline sold at Raceway stores is owned and supplied by Racetrac.

Prior to the initiation of bankruptcy proceedings, Khan contracted with Racetrac to operate a Raceway store in Roanoke Rapids, North Carolina (the "Roanoke Rapids store"). Events leading to the contract began on May 24, 2007, when Khan submitted an application to Racetrac for an operator position at a Raceway store. Racetrac promptly approved Khan's application. On July 3, 2007, Khan and Racetrac executed a Gasoline Services Agreement ("GSA") that, *inter alia*, set forth Khan's duties as the operator of the Roanoke Rapids store. With respect to convenience goods sales, the GSA provided that Khan would be required to maintain a minimum stock but would be entitled to all net profits of those sales.

The GSA was more detailed with respect to gasoline sales. Specifically, the GSA provided that "[t]itle to the proceeds of all sales by [Khan] of gasoline ('Racetrac Funds') shall at all times be vested in and belong to Racetrac[.]" GSA § 5(A). The GSA further provided that Khan would sell only Racetrac gasoline, which at all times until sold would remain the property of Racetrac, not Khan, and that "any possession and control" of gasoline sales proceeds by Khan "shall be as trustee and agent for the use and benefit of Racetrac, and [Khan] shall not use Racetrac Funds for purchases, operating expenses or otherwise." *Id.* Through the GSA, the

parties thus agreed that Khan would not own proceeds from sales of Racetrac gasoline, but instead would keep those proceeds for Racetrac's benefit. In this respect, the GSA provided that "[Khan] acknowledges that [he] owes a duty of trust to Racetrac in the collection and safe keeping of all funds collected for such sales of fuel, and acknowledges that [he] is serving in a fiduciary relationship with Racetrac." *Id.*

Consistent with the GSA, the parties agreed to a practice wherein all proceeds that Khan collected from gasoline sales would be deposited in a bank account from which Racetrac could make regular withdrawals or "sweeps" to collect those proceeds. Specifically, proceeds from the sales of both convenience goods and gasoline would be deposited in real time into a single bank account established in the name of "M-Mart" and accessible by Khan and Racetrac (the "Account"). This arrangement enabled customers wishing to purchase gasoline and convenience goods simultaneously to do so in a single credit or debit transaction without re-swiping their cards. Pursuant to this agreed practice, Racetrac on a daily basis would receive a report of that day's total gasoline sales and then sweep the Account for the amount of those sales minus 3.5 cents per gallon sold, which Khan would keep as a service fee. In other words, for every gallon of Racetrac gasoline that Khan sold at the Roanoke Rapids store, Racetrac would be entitled to the per-gallon price set by Racetrac less a 3.5 cent service fee for Khan that would remain in the Account. In sum, Khan owned proceeds from convenience goods sales (plus the service fee), while Racetrac owned proceeds from gasoline sales (less the service fee).[2]

Khan began operating the Roanoke Rapids store in September 2007. At that time, Khan was not yet prepared to move from Virginia to North Carolina. Thus, with Racetrac's

---

[2] The Bankruptcy Court described the relationship between Khan and Racetrac as "symbiotic" in that "Racetrac benefited from [Khan's] willingness to sell gasoline on its behalf, and [Khan] benefited from being able to sell convenience store goods to customers who came to purchase gasoline." Mem. Op. 5.

permission, Khan arranged to have his brother, Adeel Khan, operate the store on a daily basis in Khan's absence. Adeel Khan operated the store without incident until May 2008. After Racetrac's May 14, 2008 attempted sweep of the Account was unsuccessful owing to insufficient funds in the account, a Racetrac representative visited the store to confront Adeel Khan concerning the $4,151.68 deficiency and, as a result, received a certified check from Adeel Khan in that amount.

Barely two weeks later, events occurred that gave rise to the instant adverse action. After Memorial Day weekend 2008, Racetrac discovered that (i) the store had closed for business, (ii) many gasoline purchases made before the closing had not been properly recorded, and (iii) some unidentified person had transferred a total of $164,000 out of the Account during May 25–29, 2008.[3] Based on records, Racetrac determined that $256,807.13 in gasoline sales proceeds attributable to that weekend had gone missing. To this day, attempts to locate Adeel Khan and the missing proceeds have been unsuccessful.[4]

On June 25, 2010, Khan and his wife filed a joint petition for bankruptcy pursuant to Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 701 *et seq.* Racetrac filed this adversary proceeding on October 3, 2010 seeking a determination that Khan's debt to Racetrac in the amount of the missing gasoline proceeds was not dischargeable on the grounds that, *inter alia*, the debt was for (i) a defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4), and (ii) a willful and malicious injury by Khan to Racetrac's property under 11 U.S.C.

---

[3] The record does not indicate who initiated these transfers or what happened to the funds after they had been transferred from the Account.

[4] The Bankruptcy Court found that "[s]ubsequent to the closing of the station and the disappearance of the gasoline sales proceeds, Adeel visited [Khan] and [Khan's] family on a frequent basis." Mem. Op. 6. Khan maintained contact with Adeel Khan until February 2010, but has initiated no legal proceedings against Adeel Khan to recover the missing sums. The Bankruptcy Court also found that "Adeel is presently believed to be in Pakistan." *Id.*

§ 523(a)(6). After an evidentiary hearing and post-trial briefing, the Bankruptcy Court concluded that because the GSA "did not evidence an intent to create a trust," the fiduciary defalcation exception did not render Khan's debt to Racetrac non-dischargeable. Mem. Op. 12–13. The Bankruptcy Court apparently found it significant, if not dispositive, that the proceeds from convenience goods sales and gasoline sales were comingled in a single bank account, and that neither the GSA nor any other agreement required that gasoline sales proceeds be segregated from convenience goods sales proceeds. *See* Mem. Op. 11–13. The Bankruptcy Court then entered judgment in favor of Khan. *See Racetrac Petroleum v. Khan (In re Khan)*, Advers. No. 10-1431 (Bankr. E.D. Va. Aug. 1, 2011) (Judgment). This appeal followed. The matter has been fully briefed and argued, and is now ripe for disposition.

## II.

At issue on appeal is whether the Bankruptcy Court was correct in concluding that Khan's debt to Racetrac was not a debt for "defalcation while acting in a fiduciary capacity" and therefore did not fall within this exception to dischargeability. 11 U.S.C. § 523(a)(4). Whether Khan acted "in a fiduciary capacity" with respect to the gasoline sales proceeds is an issue of federal law that presents "a question of statutory interpretation reviewed *de novo* on appeal."[5] The Fourth Circuit has not "elaborate[d] on the question" of "the proper contours of the term 'fiduciary' as used in § 523(a)(4)," but it has recognized that the creation of an express trust under *state* law "is clearly sufficient to establish a fiduciary relationship for the purposes of § 523(a)(4)." *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493, 497 n.6 (4th Cir. 2008). In this respect, because "the creation of an express trust can give rise to the requisite fiduciary

---

[5] *U.S. Int'l Trade Comm'n v. Jaffe*, 433 B.R. 538, 542 (E.D. Va. 2010) (citing *Loudoun Leasing Dev. Co. v. Ford Motor Credit Co. (In re K & L Lakeland, Inc.)*, 128 F.3d 203, 206 (4th Cir. 1997)).

duty under § 523(a)(4)," federal law instructs seeking "guidance" from the pertinent state law governing express trusts. *Id.* at 498. In other words, if a debtor has acted as a trustee under state law with respect to property out of which a debt arises, then the debtor will also have acted in a fiduciary capacity under federal law with respect to the debt. Thus, whether Khan's debt to Racetrac falls within the federal-law fiduciary-defalcation exception turns on whether the facts—essentially undisputed here[6]—establish the creation of a state-law express trust.

At the threshold, the parties dispute *which* state's law concerning creation of express trusts should be consulted. Racetrac argues that the GSA explicitly requires the application of Georgia law; Khan responds that because Racetrac did not raise the choice-of-law issue below, the argument must be considered waived for purposes of this appeal.[7] The Bankruptcy Court's heavy reliance on *Strack*, which applied Virginia law, suggests (albeit implicitly) that Virginia law was applied below. In the end, this choice-of-law question need not be resolved because the necessary elements of express trusts appear to be substantially the same in both states. *Compare* Ga. Code § 53-12-20 (predicating creation of express trust on establishing intent to create a trust, trust property, a beneficiary, a trustee, and prescribed trustee duties) *with Leonard v. Counts*, 221 Va. 582, 588, 272 S.E.2d 190 (1980) (holding that under Virginia law, "[a]n express trust is based on the declared intention of the trustor," manifested in writing or through the parties' actions). In short, the lack of any substantial difference between Georgia and Virginia law on this issue renders this dispute moot.

---

[6] Khan neither argues, nor does the record support, that the GSA or any of its provisions is invalid on the basis of fraud, duress, mistake, or some other defense to contract formation.

[7] Khan also argues that no state law need be applied because the question whether a fiduciary relationship existed is a purely federal issue. For the reasons stated *supra*, Khan is incorrect. *See Strack*, 524 F.3d at 497–98; *Am. Bankers Ins. Co. v. Maness*, 101 F.3d 358, 363 (4th Cir. 1996) ("[W]hile federal law creates the bankruptcy estate, . . . state law, absent a countervailing federal interest, determines whether a given property falls within this federal framework.").

To determine whether an express trust has been created under state law, analysis properly focuses on the rights and duties the parties, by their words and actions, intended to create with respect to the property at issue. The Fourth Circuit in *Strack* put the matter quite succinctly, as follows:

> [i]f the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created. If[, however,] the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created.

524 F.3d at 499 (applying Virginia law) (brackets in original). To answer the question whether a trust or a debt is created, the *Strack* opinion identifies three primary indicia of an intent to create an express trust rather than a mere debt. They are: (i) the designated trustee lacks legal title to the property at issue; (ii) the trustee is restricted in his use of the property; and (iii) the property remains separate from the trustee's own property. These three indicia also evidence creation of an express trust under Georgia law. *See In re Estate of Chambers*, 261 Ga. App. 737, 740, 583 S.E.2d 565 (2003) (holding that settlor had "created a charitable trust . . . by bequeathing the bulk of his estate to charitable organizations meeting certain requirements and imposing active duties on the executor in regard to the selection of specific charities").

Given *Strack*'s guidance, the question presented in this case is whether the undisputed facts establish (i) that Racetrac, not Khan, would hold and retain legal title to the gasoline sales proceeds, (ii) that Khan was restricted in his use of the gasoline sales proceeds, and (iii) that the gasoline sales proceeds constituted a fund of money in the Account separate from Khan's money in the Account. The facts plainly establish all three.

First, the parties agreed that the gasoline sales proceeds belonged at all times to Racetrac, not Khan. The GSA provided that "[t]itle to the proceeds of all sales by [Khan] of gasoline ('Racetrac Funds') shall at all times be vested in and belong to Racetrac[.]" GSA § 5(A). Thus,

by operation of the GSA, any money Khan collected from customers for the purchase of gasoline—referred to in the GSA as "Racetrac Funds"—immediately became Racetrac's property. In this respect, the GSA reflects the parties' understanding that Racetrac, not Khan, retained ownership of all gasoline that Racetrac provided, even after the gasoline had been delivered to the Roanoke Rapids store and thus came into Khan's possession and control. This term of the GSA is also consistent with the parties' agreement that Racetrac was authorized to sweep the Account for gasoline sales proceeds, rather than to have Khan deliver those proceeds to Racetrac. Thus, the parties' clear and explicit assent to Racetrac's continuous, exclusive ownership of the gasoline sales proceeds is clear evidence of their intent to create an express trust.

Second, the parties agreed to restrict Khan's use of gasoline sales proceeds while those proceeds remained in the Account. In this regard, the GSA provided that Khan "shall not use Racetrac Funds for purchases, operating expenses or otherwise." GSA § 5(A). Not only did the GSA vest no title to the gasoline sales proceeds in Khan, but it also prohibited Khan from using those proceeds for his own benefit. Instead, the GSA provided that "any possession and control" of gasoline sales proceeds by Khan "shall be as trustee and agent for the use and benefit of Racetrac[.]" *Id.* The GSA further provided that Khan "owes a duty of trust to Racetrac in the collection and safe keeping of all funds collected for such sales of fuel, and acknowledges that [Khan] is serving in a fiduciary relationship with Racetrac." *Id.* The GSA's imposition of a fiduciary duty on Khan to serve as trustee of the gasoline sales proceeds makes unmistakably clear the parties' intention to safeguard the gasoline sales proceeds for Racetrac and ensure that these funds would be available and accessible to Racetrac.

Finally, the parties agreed that the gasoline sales proceeds would be accounted for, and maintained separately from, the convenience sales proceeds. Although both sets of proceeds were deposited into the same bank account, the gasoline sales proceeds were nonetheless a "separate fund"[8] because the sum in the Account exclusively traceable to gasoline sales could be readily determined. A "fund" is simply "[a] sum of money or other liquid assets established for a specific purpose." *Black's Law Dictionary* (9th ed. 2009). At all times, the Account contained two funds, each having a different source and a different owner: Racetrac's gasoline sales proceeds to be used for its benefit, and Khan's convenience sales proceeds to be used for his benefit. Khan's obligation to record gasoline sales separately from convenience goods sales effectively separated the funds by ensuring that the parties, at any moment, could ascertain precisely the sum in the Account attributable to gasoline sales, which constituted Racetrac's fund. In this respect, the parties clearly intended to keep the two funds separate; each party was contractually permitted to make withdrawals from the Account only up to the amount of its own fund. The parties' agreement to join both funds in the Account reflected only their intent to expedite the point-of-sale process at the Roanoke Rapids store, not to diminish or alter the parties' rights and duties with respect to the two funds. Thus, segregation into different bank accounts is not the *sine qua non* of separate funds; rather, it is sufficient if the parties intend the funds, as here, to be maintained separately in terms of accounting and use.

In sum, the parties' agreement providing for (i) Racetrac's exclusive ownership of gasoline sales proceeds, (ii) Khan's limited permitted use of those proceeds, and (iii) separate accounting of the proceeds establishes, consistent with *Strack*, an unequivocal intent to create an

---

[8] *Strack*, 524 F.3d at 499. The *Strack* decision gives no indication that the existence of an express trust in that case turned on whether the sums at issue were kept in different bank accounts. Whether segregation of funds into separate bank accounts was necessary to form an express trust was neither expressly presented, nor specifically decided.

express trust. *See Strack*, 524 F.3d at 499 (holding that an express trust had been created under Virginia law by the parties' agreement that the debtor would hold proceeds from selling the creditor's equipment in trust on the creditor's behalf and could not use those proceeds for its own benefit until the creditor had been paid satisfactorily for the sale).[9] Additional authority from the Fourth Circuit and elsewhere supports this conclusion. *See Airlines Reporting Corp. v. Ellison (In re Ellison)*, 296 F.3d 266, 270–71 (4th Cir. 2002) (concluding that an agreement that ticket sales proceeds would be the carrier's property and that the vendor would hold those proceeds for the carrier created a fiduciary relationship under West Virginia law); *Old Repub. Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 722 (4th Cir. 1998) (holding that the parties created an express trust under Virginia law when the debtor agreed "to hold the [creditors'] funds for the benefit of specified third parties" and "act merely as an intermediary" rather than "develop any equitable interest in the funds"); *Chattowah Open Land Trust v. Jones*, 281 Ga. 97, 99, 636 S.E.2d 523 (2006) (concluding that devise of property to a charitable trust for specified uses and placement of duties on trustee to maintain the property created a trust).

---

[9] It is worth noting that, as the Bankruptcy Court correctly observed, the parties' use in the GSA of the terms "trust," "trustee," and "fiduciary," is not conclusive on the existence of a fiduciary relationship. *See Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333–34 (1934) (holding that an "obligation is not turned into one arising from a trust because the parties to one of the documents has chosen to speak of it as a trust"); *see also Chattowah Open Land Trust v. Jones*, 281 Ga. 97, 99, 636 S.E.2d 523 (2006) (noting that "strict use of the[] terms ['trust' and 'trustee'] is not required to establish a trust"). Even so, the parties' repeated use of these terms cannot be ignored; that use is some evidence that the parties intended to create a trust relationship. Yet, in the end, the proper focus of the inquiry is not the mere use of the terms, but rather the rights vested in Racetrac and the duties imposed on Khan.

In this case, the parties' agreement differed substantially from the agreement in *Davis* but resembled starkly the agreement in *Strack* inasmuch as the GSA "in no uncertain terms demonstrates the intention . . . that the [proceeds] . . . be kept or used as a separate fund for the benefit of" Racetrac. *Strack*, 524 F.3d at 500 (distinguishing *Davis* on this basis) (brackets in original).

The parties' agreement that gasoline and convenience sales proceeds could be comingled in the same bank account does not require a contrary conclusion. An agreement that allows comingling of funds in trust with other non-trust funds does not negate the existence of a fiduciary relationship. *See Strack*, 524 F.3d at 499 (noting that under Virginia law, "[a]ll that is necessary is the unequivocal intent that the legal estate [be] vested in one person, to be held in some manner or for some purpose on behalf of another") (citation and internal quotation marks omitted); *Quaif v. Johnson*, 4 F.3d 950, 954 (11th Cir. 1993) (rejecting argument that under Georgia law, "a separation of premium funds into distinct bank accounts is an essential requirement of a trust").

The decisions on which Khan relies, none of which are binding here, do not compel a different conclusion. *See Energy Mktg. Corp. v. Sutton (In re Sutton)*, 39 B.R. 390, 394–95 (Bankr. M.D. Tenn. 1984). *In re Sutton* cites very few cases and offers hardly any explanation supporting its conclusion that creating an express trust requires segregating funds into different bank accounts. That decision also involved an arrangement that closely resembled a debtor-creditor agreement and therefore differed from an express trust in a critical respect, namely, that the debtor there (unlike Khan) was responsible for remitting payments to a creditor that (unlike Racetrac) was not authorized to sweep the debtor's account. *Id.* at 395; *see also In re Williams*, 2 Collier Bankr. Cas. 2d (MB) 796, 7 Bankr. Ct. Dec. 45 (Bankr. W.D. Va. 1980) (distinguishable for this reason); *Greyhound Lines, Inc. v. Thurston (In re Thurston)*, 18 B.R. 545 (Bankr. M.D. Ga. 1982) (same). The remaining decisions are clearly distinguishable on their facts. *See Am. Honda Fin. Corp. v. Tester (In re Tester)*, 62 B.R. 486 (Bankr. W.D. Va. 1986) (noting that the contract at issue was clearly a security agreement in which the word "trust" appeared only once); *Save-On Oil Co. v. Wise (In re Wise)*, 6 B.R. 867 (Bankr. M.D. Fla. 1980)

(noting that the debtor had exclusive access to creditor's funds, which the debtor could use without restriction). Thus, these decisions fail to persuade.

### III.

Because an express trust was created with respect to the gasoline sales proceeds, the loss of which gave rise to Khan's debt to Racetrac, it must be concluded that Khan was "acting in a fiduciary capacity" under § 523(a)(4) while he possessed and controlled those proceeds. Accordingly, the judgment of the Bankruptcy Court must be reversed. The remaining grounds presented for appeal, including whether Khan's debt constituted a willful and malicious injury to property under § 523(a)(6), need not be addressed or decided here since reversal is merited on the grounds stated. This matter will be remanded to the Bankruptcy Court for further proceedings consistent with this Memorandum Opinion, which include, *inter alia*, resolution of the question whether a "defalcation" occurred under § 523(a)(4).[10]

An appropriate Order will issue.

Alexandria, Virginia
December 30, 2011

/s/
T. S. Ellis, III
United States District Judge

---

[10] On remand, it should be remembered that "[t]o be a defalcation . . . an act need not rise to the level of . . . 'embezzlement' or even 'misappropriation.'" *Strack*, 524 F.3d at 498 n.7 (citation omitted). Indeed, "[n]egligence or even an innocent mistake which results in . . . failure to account is sufficient" to constitute a defalcation within the meaning of § 523(a)(4). *Repub. of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir. 2001).